IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE | : CHAPTER 7 |
| | : |
| AMERICAN REHAB & PHYSICAL | : |
| THERAPY, INC. | : |
| | : |
| _____ | CASE NO. 04-14562 |
| ROBERT H. HOLBER, TRUSTEE | : |
| | : |
| PLAINTIFF | : |
| V. | : |
| | : |
| DOLCHIN SLOTKIN & TODD, P.C., | : |
| ADVANCED MEDICINE ASSOCIATES, P.C., | : |
| B.N.A., P.C., | : |
| AMBULATORY CARE CENTER P.C., | : |
| ARIE OREN, M.D., AHUVA OREN, M.D., | : |
| ANDREW BERKOWITZ, M.D. | : |
| | : |
| DEFENDANTS | : ADVERSARY PROCEEDING NO. 04-0847 |
| _____ | : |

## OPINION

By:   STEPHEN RASLAVICH, UNITED STATES BANKRUPTCY JUDGE.

*Introduction*

Over two days of testimony, the Court heard the Trustee's avoidance claims

against Dolchin Slotkin & Todd, PC, ("Dolchin") and the Trustee's Motion for Approval of

Settlement as to the other Defendants.  For the reasons set forth below, judgment will

be entered in the Trustee's favor against Dolchin and his Motion to Approve Settlement

with the remaining Defendants will be granted.

*The Complaint*

The Trustee has sued a law firm (Dolchin), three corporations (Advanced

Medicine Associates, BNA, and Ambulatory Care Center) and their principals (Drs.

Oren, Oren and Berkowitz).  His claims arise out of the Debtor's prepetition sale of its

business to these corporations.  It is alleged that the corporations never paid the

purchase price and that their principals have failed to honor their guarantees of those

debts.  As to the law firm, it is alleged that it received avoidable transfers.  *See generally*

Complaint.  The Defendants oppose the Complaint.

*The PreTrial Background*

The Trustee believes that he reached a settlement with the corporate defendants

and the principals and so filed a motion to approve that settlement.  That motion was

scheduled to be heard the same day as the trial against Dolchin on the avoidance

claims.  The Defendants now disavow any accord.  At the trial, Dr. Oren appeared on

behalf of the defendants other than Dolchin and requested a continuance in order to

obtain new counsel.[1]  The Court granted that request in part.  Dr. Oren and the other

(non-Dolchin) defendants were given a short time to find new counsel, but the trial

proceeded that day on the claims against Dolchin.

*The Motion to*
*Approve Settlement*

Two weeks after the trial on the avoidance claims, the Court heard the Trustee's

Motion to Approve Compromise.  The Trustee maintains that he reached an accord with

the corporate defendants and their principals.  Dr. Oren appeared pro se[2] and on behalf

---

[1]The non-Dolchin Defendants' counsel, believing it likely that his testimony would figure in
the dispute over the existence of a settlement, had sought and obtained, without objection, leave
to withdraw.

[2]Although given the opportunity to obtain new counsel, neither Dr. Oren, nor any other non-
Dolchin Defendant, did so.

of the other individual defendants[3] to challenge that claim.  He claims that he never

authorized his former counsel to settle on the terms alleged.  Dolchin also opposes the

settlement, but for different reasons.

A settlement agreement is a contract which must be interpreted and enforced in

accordance with relevant principles of contract law.  *Plymouth Mutual Life Insurance Co.

v. Illinois Mid-Continent Life Insurance Co.*, 378 F.2d 389, 391 (3rd Cir.1967).  To

determine whether a settlement agreement is binding on a party, a federal court must

turn to state law.  *In re Paolino*, 85 B.R. 24, 29 (Bankr.E.D.Pa.1988).  Here, the law of

Pennsylvania applies.

"An agreement to settle a law suit voluntarily entered into, is binding upon the

parties, whether or not made in the presence of the court and even in the absence of a

writing." *Green v. John H. Lewis & Co.*, 436 F.2d 389, 390 (3rd Cir.1970); *Good v.

Pennsylvania R.R. Co.*, 384 F.2d 989, 990 (3rd Cir.1967); *Morris v. Gaspero*, 522

F.Supp. 121, 124 (E.D.Pa.1981).  As a matter of public policy, courts are to favor

voluntary settlements of litigation. *See Williams v. First National Bank*, 216 U.S. 582,

595, 30 S.Ct. 441, 445, 54 L.Ed. 625 (1910); *Martos v. Concilio,* 427 Pa.Super. 612,

615, 629 A.2d 1037, 1039 (Pa.Super. 1993).

In Pennsylvania, an attorney may compromise a client's case when that attorney

has been given express, actual authority to do so.  A client is not bound to a settlement

by his or her attorney's apparent authority to settle.  *Rothman v. Fillette*, 503 Pa. 259,

---

[3]Under Pennsylvania law, Dr. Oren could not appear on behalf of the corporate defendants.
A corporation must be represented by counsel: a pro see individual does not satisfy that
requirement.  *Laborer's District Council v. Compliance Mgmt Group, Inc.*, 2005 WL 1331059 *1
(E.D.Pa.).

264, 469 A.2d 543, 545 (1983); *Archbishop v. Karlak*, 450 Pa. 535, 539, 299 A.2d 294,

296 (1973); *see Daly v. Bright*, 413 F.Supp. 28, 30 (E.D.Pa.1975).  Because a client's

ability to understand the terms and conditions of a proposed settlement is relevant to a

determination of whether actual authority to settle the case was given, an attorney must

review the terms of the proposed settlement with the client prior to obtaining actual

authority.  *Paolino,* 85 B.R. at 29.  It is the client's burden to establish that his or her

attorney lacked the requisite authority.  *Id. citing Edwards v. Born, Inc.*, 792 F.2d 387,

390 (3d Cir.1987) ("[A] settlement, once entered, may be set aside only if the client

produces proof that the attorney had no right to consent to its entry.");  s*ee also e.g. In

re Scott*, 82 B.R. 760, 762 (Bankr.E.D.Pa.1988).  Against this backdrop, the Court

considers what the record demonstrates as having happened here.

On January 18, 2006, a settlement conference convened at the offices of

Defendants' then counsel, Paul Bucco, Esquire.  The day after the meeting, Mr. Bucco

faxed a letter to Trustee's counsel memorializing what he described as a "full and

complete settlement." See Exhibit attached to Motion.  The letter also recited the

consideration, payment terms, and a grace period.  Importantly, the letter states *no*

condition precedent or contingency relating to the collection of certain receivables

carried on the books of the corporation which had been the subject of the sales

transaction.  Copies of the letter were sent to Dr. Oren and the Trustee.  On February

24, 2006, the Trustee filed a Motion to Approve Compromise on the terms stated in the

January 19 fax.  The Defendants, via Mr. Bucco, filed an answer opposing the motion.

Paragraph 5 of that answer sets forth the reason why the Defendants deny any accord:

Defendants' settlement of the matter was contingent upon
the ability to collect certain outstanding receivables that are
owed to Defendants by third-parties who are not involved in
this action or the bankruptcy case.  As discussed at the
meeting, Defendants' ability to pay the settlement was
directly tied to their ability to collect those receivables.
Although Defendants *believed* that collection was possible at
the time of the January 18, 2006 meeting, Defendants *now
realize* that those receivable are probably not collectible.
Accordingly, the settlement did not and cannot take place.

Defendants' Answer, ¶5.  (emphasis added)  Because what is alleged in the Answer is

completely at odds with Mr. Bucco's fax of January 19, the Court must delve further into

the record to ascertain if an agreement was struck.

The Trustee confirmed that he, his counsel,  Dr. Oren, and his counsel, and

Richard Privitera (former principal of the corporation whose assets were sold) were

present at the January 18 meeting.  Transcript of 4/6/06 hearing (T)-8  Dr. Oren

represented that he was present on behalf of all of the other non-Dolchin Defendants.

*Id*.  In negotiating a settlement, the Trustee recalls that one of the offers discussed was

to pay the Trustee from receivables collected by the Defendants.  T-9  That, however,

was not the only offer.  *Id.*  A lump sum payment was also considered, but what the

parties agreed upon was a payout over time.  *Id.*  The agreed upon payment terms were

40 monthly payments of $1500, although the Trustee initially sought a higher monthly

payment.  *Id.*  Significantly, the Trustee made it clear that the terms of the parties'

agreement was accurately memorialized in Mr. Bucco's fax of the next day.  T-9.

In contrast to the January 19 fax, Dr. Oren contends that nothing was settled at

the January 18 meeting.  T-18  He claims that all counsel present assured him that their

discussions were "off the record."  T-22.  Dr. Oren insists that he was negotiating on

behalf of the Defendants at the meeting and would take back to them any offers made

for their consideration.  *Id*.  When he received Mr. Bucco's January 19 letter, he recalls

that he "called him immediately and say [*sic*] I disagree with this letter and don't send it

on my behalf."  T-25.  But the letter had already been sent.  *Id*.  In essence, Dr. Oren

alleges that Mr. Bucco's accepted an offer without authority from his clients to do so.

The record does not support Dr. Oren's position.  There is more than one reason

for this conclusion.  First, the premise of his testimony – that nothing was settled on that

date – is expressly contradicted by Mr. Bucco's letter.  One could hardly imagine a

better example of evidence against Oren's and the other defendants' interests.  Second,

Dr. Oren was present with his counsel at the meeting so it is hard to accept that Mr.

Bucco had gotten his client's intentions (or instructions) so completely wrong.  When

client and counsel are together, there is much less chance of miscommunication. Third,

Dr. Oren's testimony is not even consistent with his answer to the Trustee's Motion to

Approve Settlement.  The answer speaks of a "belief" as to collectibility, but it never

states that collectibility was an express condition of settlement.  Instead, it appears from

his own pleading that he chose to take the risk of uncollectibility, a risk which was later

"realized."  *See* Answer ¶ 5.  Fourth, the Court finds Dr. Oren's testimony to be less

than credible as a general matter.  He claims, for instance, that he had to take back any

offer to the other defendants, but clearly implied that he had authority to settle the

Trustee's claim from collections on the receivables which he and the other defendants

purchased from the Debtor.  T-22.

Moreover, Dr. Oren repeatedly contradicted himself in explaining *when* he

informed Mr. Bucco that he, Oren, never agreed to the terms in the January 19 fax.  He

first claims to have called Mr. Bucco "immediately" after receipt of the January 19 fax,

but then proceeded to testify that he "hasn't seen this letter before," and then states that

he "just got a copy after Mr. Case got it."  T-25.  This prompted the Court to ask Dr.

Oren directly *when he got a copy of that letter*.  *Id*.  Dr. Oren answered that he received

a copy "four or five days later" but explained that he "was out of town so I really read it

maybe a week later."  *Id*.  From this the Court cannot tell if, much less when, Dr. Oren

ever contacted Mr. Bucco.  This matters, given the black-letter principle of agency law

that "[a]n affirmance of an unauthorized transaction can be inferred from a failure to

repudiate it."  *See* Restatement (Second) of Agency § 94.  As the Supreme Court of

Pennsylvania has explained, "a client makes his attorney's act his own if he does not

disavow it the first moment he receives knowledge that his attorney has transcended his

authority."  *Yarnall v. Yorkshire Worsted Mills*, 370 Pa. 93, 96, 87 A.2d 192, 193 (1952);

*accord Piluso v. Cohen*, 764 A.2d 549, 550 (Pa.Super.2001).  Finally, the Court

observes that Mr. Bucco, who anticipated being called as a witness, and who could

have corroborated Dr. Oren's version of the events and their chronology, was never

called to testify.  Simply put, Dr. Oren's testimony in support of his claim that he did not

give his attorney authority lacks credibility, and his contention that an enforceable

agreement was not made is thus rejected.

What Dr. Oren's testimony reveals is really just a classic case of "buyer's

remorse."   After purchasing the Debtor's assets, Dr. Oren discovered that the

businesses had run up significant  utility bills.  T-13.  He also discovered that the three

rehab centers were not operable because insurance companies would not pay for

services rendered in connection with the business formerly owned by the Debtor.  T-20.

The businesses had lain idle for some time.  T-20.  As a matter of principle, it seems,

Dr. Oren is not willing to pay for three businesses he now considers worthless.  T-21.

The Trustee, however, sees things quite differently and has sued to enforce the bargain.

Ironically, Dr. Oren's counsel, Mr. Bucco, is reported to have agreed with Dr. Oren that

he had been defrauded regarding the value of the businesses and would likely owe the

Trustee nothing, but explained to him that it would cost a significant amount in legal fees

to prove that.  T-21.  Mr. Bucco is reported to have estimated the cost of this defense to

be $10,000.  *Id.*  With that "figure in mind," Dr. Oren appears to have been prepared to

discuss settlement for somewhere in the range of "zero" to $10,000. (T-21).  But at the

settlement meeting, Dr. Oren came "under [the] impression" that the receivables would

generate enough cash to pay the Trustee some agreed upon sum.  T-23.  This is likely

the result of Mr. Privitera's assurances that the receivables were worth $700,000.  T-23.

Even at a steep discount, collection of those accounts would yield enough to pay any

settlement.  That would explain, perhaps, why Dr. Oren wanted to stretch out the

payments as long as possible (T-23); to wit: he would be able to settle with the Trustee

without having to pay any of his own money.  These were among the various "beliefs"[4]

and "impressions"[5] which Dr. Oren harbored.  The problem for Dr. Oren is that they

were never made express terms of the settlement.  The Court therefore rejects Dr.

Oren's claim that his counsel settled the case without authority.  On the contrary, the

---

[4]Defendants' Answer, ¶5.

[5]T-23.

record supports the Trustee's position that an enforceable agreement was reached by the parties.

*Dolchin's Objection
to the Motion to Approve*

While not a party to the settlement, Dolchin also opposes it. Dolchin maintains that the settlement will impair its secured interest in the promissory notes which the Defendants gave the Debtor in payment of the purchase price for the assets sold to them. As proposed, the settlement between the non-Dolchin Defendants and the Trustee required those Defendants to pay the Trustee $75,000. That happens to be the same amount of the notes which the Defendants gave the Debtor when they bought the Debtor's businesses. Those same notes, Dolchin contends, were pledged to Dolchin which is owed roughly $48,000 by the Debtor. *See* Claims Docket, #20. Dolchin maintains that any payment on the first $48,000 which Defendants make to the Trustee are subject to Dolchin's secured interest in those notes.

Dolchin's argument is based on a partly flawed premise. The very transfer from which Dolchin's security interest arises will be found *infra* to be an avoidable transfer, giving rise to no enforceable claim to the notes. Dolchin, accordingly, cannot argue that it is adversely affected by this settlement and its objection, too, will be dismissed.

In summary, the Court finds that a settlement on the Trustee's collection claims was reached on January 18, 2006. The Trustee's Motion to Approve Settlement will, therefore, be granted. Having found that the Trustee has an enforceable collection claim against the Defendants, the Court turns now to the related claim against Dochin. Dolchin claims an interest superior to that claimed by the Trustee in the consideration

which the Defendants gave to the Debtor when it purchased the Debtor's assets, i.e., the promissory notes.  The Trustee, conversely, maintains that Dolchin's interest in that property was obtained in violation of the Bankruptcy Codes's avoidance provisions and may be set aside.

*The Record as to*
*the Avoidance Claims*

The Debtor was in the business of providing physical therapy and rehabilitation services.  Transcript of 3/22/06 hearing (T)- 51.  Two months before its bankruptcy, it sold its business to the corporate defendants.  *See* Ex. D-2,3,4.   For these assets, the Debtor received cash and promissory notes from the corporate defendants and guaranties from the principals.  *Id.*  Dolchin, the law firm, represented the Debtor in those transactions and was paid $2500 for that work at the time of the settlement.

One month later, the Debtor was about to go to trial in a suit brought against it by Allstate Insurance Company.  Dolchin was representing the Debtor in that case.  The Debtor was behind on its legal bills and Dolchin was concerned with whether the Debtor was going to be able to pay for what promised to be an expensive trial.  The Debtor executed an Irrevocable Assignment of Rights in the promissory notes to Dolchin to secure payment of its fees.  D-6.  One week later, the jury in the Allstate case rendered a verdict against the Debtor for $318,000.  T-53.  About six weeks after that, the Debtor filed this bankruptcy case.

*The Parties' Arguments*

The Trustee's avoidance claims break down into two distinct groups: avoidance of Dolchin's *security interest* in the notes and avoidance of the $2500 *fee* and *assignment* of the promissory notes as either preferential or fraudulent *transfers*. Dolchin disputes that its security interest is avoidable and argues that the Trustee's claim that the transfers may be avoided fails.

*Avoidance of the
Security Interest*

The Trustee maintains that he may avoid Dolchin's security interest in the notes.[6]

Section 544(a) provides:

> (a) The trustee shall have, as of the commencement of the case, and without regard to any knowledge of the trustee or of any creditor, the rights and powers of, or may avoid any transfer of property of the debtor or any obligation incurred by the debtor that is voidable by--
>
> (1) a creditor that extends credit to the debtor at the time of the commencement of the case, and that obtains, at such time and with respect to such credit, a judicial lien on all property on which a creditor on a simple contract could have obtained such a judicial lien, whether or not such a creditor exists;

11 U.S.C. § 544(a)(1).  Known as the "strong arm clause," this provision is intended to cut off unperfected security interests, secret liens and undisclosed prepetition claims against the debtor's property as of the commencement of the case.  5 *Collier on Bankruptcy* ¶ 544.03.  The Trustee maintains that Dolchin's security interest in the

---

[6]This was first argued at the conclusion of the trial.  Even though he did not specifically plead that cause of action, the Trustee offered to amend the complaint to include such a claim.  The Court explained to the Trustee that it has the authority to conform the pleadings to the proofs.  *See* T-137; F.R.C.P. 15(b) as incorporated by B.R. 7015(b).

promissory notes was unperfected on the date of the bankruptcy filing.  T-137.  Dolchin

disputes the claim that its interest is unperfected.  T-144.

The Trustee sees a failure of perfection in the UCC-1 Financing Statements filed

by Dolchin.  T-112.  They describe the collateral as "inventory, fixtures, equipment and

miscellaneous assets" when, in fact, what served as security is the promissory notes

themselves.  *See* Ex. D-7.  Dolchin maintains that regardless of what is described in the

UCC-1's, its interest in the notes was perfected upon possession.  T-144.  The Court

agrees.

Pennsylvania law provides certain exceptions to the filing requirement for

perfection of a security interest.  The relevant statute provides:

> (b) Exceptions: filing not necessary.--The filing of a financing
> statement is not necessary to perfect a security interest:
> …
> (6) in collateral in the secured party's possession under
> section 9313 (relating to when possession by or delivery to
> secured party perfects security interest without filing);

13 P.S. § 9310(b)(6).  Section 9313 specifically provides that a secured party may

perfect its interest in an instrument by possession:

> (a) Perfection by possession or delivery.--Except as
> otherwise provided in subsection (b), a secured party may
> perfect a security interest in negotiable documents, goods,
> instruments, money or tangible chattel paper by taking
> possession of the collateral. A secured party may perfect a
> security interest in certificated securities by taking delivery
> under section 8301 (relating to delivery).

13 P.S. § 9313(a).  Upon execution of the assignment, Dolchin took possession of the

notes.  T-69, 130.  Presently, they are in possession of Dolchin's counsel.  T-69.  The

record demonstrates, then, that Dolchin properly perfected its security interest in the

-12-

promissory notes.  The Trustee's claim that he may avoid Dolchin's lien under § 544(a)

must fail.  What remains to be seen, however, is to what extent this finding assists

Dolchin in defending the other claims.

*The Preference Case*

The Court turns now to the preference claim.  Section 547(b) sets forth the

elements of a claim for a preferential transfer as follows:

> (b) Except as provided in subsection (c) of this section, the
> trustee may avoid any transfer of an interest of the debtor in
> property–
> (1) to or for the benefit of a creditor;
> (2) for or on account of an antecedent debt owed by the
> debtor before such transfer was made;
> (3) made while the debtor was insolvent;
> (4) made–
> (A) on or within 90 days before the date of the filing of the
> petition;  or
> (B) between ninety days and one year before the date of the
> filing of the petition, if such creditor at the time of such
> transfer was an insider;  and
> (5) that enables such creditor to receive more than such
> creditor would receive if–
> (A) the case were a case under chapter 7 of this title;
> (B) the transfer had not been made;  and
> (C) such creditor received payment of such debt to the
> extent provided by the provisions of this title.

11 U.S.C. § 547(b).  The Trustee bears the burden of proving the above elements by a

preponderance of the evidence. *See In re Biggs, Inc.*, 159 B.R. 737, 742

(Bankr.W.D.Pa.1993).

-13-

*Was the Payment to the*
*Defendants A Transfer of*
*An Interest of the*
*Debtor in Property?*

A transfer is preferential only if the property transferred belongs to the debtor.  5

*Collier on Bankruptcy*, ¶547.03[2] (Matthew Bender 15th Ed. Revised 2003).  The term

"transfer" is broadly defined in § 101 as "every mode, direct or indirect, absolute or

conditional, voluntary or involuntary, of disposing of or parting with property or with an

interest in property, including retention of title as a security interest and foreclosure of

the debtor's equity of redemption." 11 U.S.C. § 101(54).  This would include the

assignment and pledging of the promissory notes to Dolchin.

The term "interest of the debtor in property" is not defined in the Bankruptcy

Code.  *United States v. Begier*, 496 U.S. 53, 58, 110 S.Ct. 2258, 2263 (1990).  Because

the purpose of the avoidance provision is to preserve the property includable within the

bankruptcy estate — the property available for distribution to creditors — "property of

the debtor" subject to the preferential transfer provision is best understood as that

property that would have been part of the estate had it not been transferred before the

commencement of bankruptcy proceedings.  *Id.*  For guidance, then, we must turn to §

541, which delineates the scope of "property of the estate" and serves as the

postpetition analog to § 547(b)'s "interest of the debtor in property." *Id.* at 58-59, 110

S.Ct. at 2263.  Section 541 provides that the bankruptcy "estate is comprised of ... all

legal or equitable interests of the debtor in property as of the commencement of the

case." 11 U.S.C. § 541(a)(1).

Had the Irrevocable Assignment not been made, the Debtor could count among its assets the $75,000 in promissory notes. Likewise, the $2500 which it received at the asset sale was paid from proceeds which otherwise would have gone to the Debtor. What was transferred in both instances, then, was an interest of the Debtor in property.

*Was the Transfer to or*
*For the Benefit of a Creditor?*

Section 547(b)(1) provides that the trustee may avoid as a preference a transfer of an interest of the Debtor's property "to or for the benefit of a creditor." 11 U.S.C. § 547(b)(1). Section 101(10), in pertinent part, defines a "creditor" to mean an "entity that has a *claim* against the debtor that arose at the time of or before the order for relief concerning the debtor." 11 U.S.C.§101(10)(A) (emphasis added). Section 101(5), in pertinent part, defines a "claim" to mean "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured." 11 U.S.C. §101(5)(A)

Dolchin was a creditor at the time it took the assignment. Dolchin's invoices demonstrate that it was owed at least $6000 at the time of the asset sale (Ex. D-5), at least $35,000 at the time of the assignment (Ex. D-9, 10), and $48,000 at the time of the bankruptcy. *See* Claims Docket, #20. The Court, accordingly, finds this element to the Trustee's case to have been met.

*Was the Transfer Made*
*For or on Account of an*
*Antecedent Debt?*

Section 547(b)(2) requires the transfer to have been made "for or on account of an antecedent debt owed by the debtor before such transfer was made." 11 U.S.C.

§547(b)(2).  Although "antecedent debt" is not defined by the Bankruptcy Code, a debt
is "antecedent" if it is incurred before the transfer.  5 *Collier on Bankruptcy* ¶547.03[4];
*accord In re Southmark Corp.*, 88 F.3d 311, 316 (5th Cir. 1996).

Dolchin insists that the $2500 payment was not for antecedent debt.  T-143.  It
maintains that the fee was paid contemporaneously at the time services were renderd,
i.e., the sale of the assets.  The Court agrees.  Dolchin was paid at the time of
settlement, from the settlement proceeds, and for drafting the sale documents.

That is not the case, however, as to the Irrevocable Assignment.  It was made to
secure outstanding legal fees, as well as those to be incurred.  Based on that, the Court
finds that the assignment was made as to antecedent debt.[7]

*Was the Debtor Insolvent*
*When it Paid the Defendants?*

The transfer must also have been made "while the debtor was insolvent."  11
U.S.C. § 547(b)(3).  The Bankruptcy Code defines "insolvent" as a "financial condition
such that the sum of [the] entity's debts is greater than all of [the] entity's property, at a
fair valuation...." 11 U.S.C. § 101(32)(A).  A "balance sheet" test determines insolvency:
The debtor is insolvent when its liabilities exceed the fair market value of its nonexempt
assets.  5 *Collier* ¶ 547.03[5].

Pursuant to Section 547(f) of the Bankruptcy Code, a debtor is presumed to have
been insolvent during the 90 days preceding the bankruptcy filing.[8]  "A presumption

---

[7]This finding moots any argument that the $2500 transfer is immune from avoidance based
on the affirmative defenses raised.

[8]Section 547(f) states that "[f]or the purposes of this section, the debtor is presumed to have
been insolvent on and during the 90 days immediately preceding the date of the filing of the
(continued...)

imposes on the party against whom it is directed the burden of going forward with evidence to rebut or meet the presumption." Fed.R.Evid. 301.[9]  Therefore, Dolchin—who contests the claim of insolvency—must present sufficient evidence that the Debtor was solvent on the date of the asset purchase to rebut the presumption created by section 547(f).  If Dolchin fails to present evidence to rebut the presumption, then the Trustee is entitled to rely on the presumption to establish that it was insolvent on that date.  *See also In re Old World Cone Co.*, 119 B.R. 473, 477 (Bankr.E.D.Pa.1990).  However, if Dolchin presents evidence that rebuts the presumption, then the burden of persuasion shifts to the Trustee to convince the Court that the Debtor was insolvent on the relevant date. *See* 11 U.S.C. § 547(g). *See also Trans World Airlines*, 180 B.R. 389, 404 (Bankr.D.Del.1994); *Old World Cone Company*, 119 B.R. at 477.

Dolchin's claim that the Debtor was solvent is based primarily on the testimony of one of the firm's partners, Joel Todd, Esquire.  Mr. Todd is the senior litigation partner at the Dolchin firm.  T-96.  He represented the Debtor and its principals in their defense of the litigation brought by Allstate.  T-79.  That suit alleged that the Debtor and its principals had defrauded Allstate.  According to Mr. Todd, after years of litigation, and on the eve of trial, he believed that his client could settle the matter for a payment of $200,000.  He recalls recommending that his client accept this offer given the amount of

---

[8](...continued)
petition."  11 U.S.C. § 547(f).

[9]Federal Rule of Bankruptcy Procedure 9017 makes the Federal Rules of Evidence applicable in bankruptcy cases.

the initial demand ("millions," T-93) and the risks inherent in trials generally.  *Id.*  Against

his advice, his client rejected the settlement offer and opted for trial.  T-94  Mr. Todd

advised his client that trying the case would be an expensive undertaking.  He

estimated that the cost would be about $25,000 to $50,000.  T-93  The Debtor was

already behind on its bills from Dolchin and so the issue came up of how to pay Dolchin.

T-94.  Mr. Todd recalls that Mr. Privitera, the Debtor's president, suggested assigning

the promissory notes received the previous month from the asset sales.  T-94,95   That

assignment occurred on February 20, 2004.  Ex. D-6.  According to Mr. Todd, his

client's decision not to settle would prove disastrous.  T-100  The jury found in favor of

Allstate in the amount of $318,000.  T-50  That award against the Debtor would have

subsequently been trebled by the trial court but for the bankruptcy.  *See* Docket No.

2:01-cv-05076, ##82,84.  The effect of the judgment was to render worthless the

Debtor's $2.5 million worth of accounts receivable.  T-98.  Dolchin's premise,

nevertheless, is that at the time of the assignment, the Debtor was solvent, because it

could have stayed solvent had it accepted the Allstate offer to settle.  T-145.  The Court

disagrees.

In the first place there is really no competent evidence that a settlement was

available.  There is only the testimony of Mr. Todd.  For a variety of reasons, the Court

accords slight probative weight to Mr. Todd's testimony.  First, there is direct testimony

which contradicts Mr. Todd's premise.  The Debtor's President, Mr. Privitera, does not

recall being advised to settle on the eve of trial.  He recalls such a discussion having

occurred *at least a year prior to trial*—not two weeks before.  T-35.  Indeed, according to

Privitera, Mr. Todd never, in fact, suggested to him that he settle the case.  T-36, 46-

-18-

47.[10]  Needless to say, as between the two witnesses, Mr. Privitera is by far the more

disinterested, and the Court therefore accords greater weight to his version of events.

Put differently, while both witnesses appeared generally to be credible, Mr. Todd and

his firm have a direct pecuniary interest in the determination of the fact in dispute, giving

the Court more hesitancy as to Mr. Todd's recollection.  This is particularly so as

Dolchin produced no other competent, corroborative evidence of the purported

$200,000 settlement offer.  No one from Allstate, for example, testified, nor was a term

sheet or any other correspondence or written supporting documentation produced.

Indeed, all that was offered in connection with the alleged settlement offer was hearsay

from Mr. Todd.  Add to this the discrepancies between client and counsel regarding

when offers were communicated and Dolchin's position as to solvency, to the extent it is

pinned on an alleged potential settlement, becomes untenable.[11]

Additionally problematic is Dolchin's fairly simplistic argument that up until the

moment of the jury verdict, the Debtor was financially healthy.  The Court notes that the

jury verdict confirmed that the Debtor had been systematically defrauding Allstate.  A

---

[10]However, Privitera did recall that "a day or two prior to the trial, there was talk of a settlement;" however, that is specific as he gets.  T-35

[11]Neither party discussed the admissibility of the alleged offer from Allstate.  Bankruptcy Rule 9017 makes Federal Rule of Evidence 408 applicable.  That rule precludes "[e]vidence of (1) furnishing or offering or promising to furnish, or (2)accepting or offering or promising to accept, a valuable consideration in compromising or attempting to compromise a claim which was disputed as to either validity or amount, is not admissible to provide liability for or invalidity of the claim or its amount." F.R.E. 408.  While not precisely on point, such that exclusion of competent evidence of a potential settlement with Allstate would perhaps not be required, there are clear parallels which arguably might justify excluding such evidence.  Rule 408 renders settlement offers inadmissible to prove a pivotal issue; to wit: liability.  Dolchin would use evidence of an alleged settlement offer similarly herein by seeking to admit it to prove the pivotal issue of solvency.  The rationales which animate Rule 408 (prejudice, relevance, etc.) would thus appear equally apposite in this context.

similar suit was pending against the Debtor at the same time by State Farm Insurance

Company.  To the Court, the totality of these circumstances suggests that the book

value of the assets of the Debtor was vastly overstated at the time of the assignment of

the notes.  The fact that this became known to the world only when the jury announced

its verdict does not obscure the fact that the unlawful conduct long preceded the verdict.

The fair value of the receivables, according to Dolchin, hinged on their having been no

fraudulent conduct, or on the ability of the Debtor to settle the charges for cents on the

dollar.  As noted above, there is really no persuasive evidence of a possible settlement.

The fraud charges, conversely, were proven, and the fraudulent conduct had long

preceded the verdict.  That being so, the Court rejects the argument that the fair value

of the receivables should be viewed as being their full book value until the very moment

of the verdict.  Rather, the company, knowing what was ultimately proven, should have

reduced the value of the receivables to reflect the facts.  Viewed thusly, the receivables

had likely been of scant value for some time.  At a minimum, the Court concludes that

they were of scant value well before the Debtor assigned the promissory notes to

Dolchin.  Dolchin accordingly has failed to rebut the presumption of insolvency and the

Trustee therefore prevails on this prong of his case.

*Was the Transfer Made*
*Within the Preference Period?*

A preferential transfer is one "made … on or within 90 days before the date of the

filing of the petition…" 11 U.S.C. § 547(b)(4)(A).   No one disputes when the asset

purchase agreements were entered into: January 2004.  Neither does Dolchin dispute

the date of the assignment and pledge: February 2004. The case commenced April 2,

2004. The Debtor has therefore met the timing requirement for a preference.

*Did the Transfer Enable Defendants to
Receive More than they Would Have
Otherwise Received?*

That leaves the last element: that the transfer enabled Dolchin to receive more

than it would otherwise have if the case were a chapter 7 liquidation case, if the transfer

had not been made, and if the creditor received payment of the debt to the extent

provided by the provisions of the Bankruptcy Code. 11 U.S.C. §547(b)(5). This

requires a comparison between what the creditor actually received and *what it would*

*have received under the chapter 7 distribution provisions* of the Code. 5 *Collier*

¶547.03[7] (emphasis added). Section 547(b)(5) codifies the Supreme Court's holding

in *Palmer Clay Products Co. v. Brown*: whether a particular transfer is preferential

should be determined "not by what the situation would have been if the debtor's assets

had been liquidated and distributed among his creditors at the time the alleged

preferential payment was made, but by the actual effect of the payment as determined

when the bankruptcy results." *Id.* quoting 297 U.S. 227, 229, 56 S.Ct 450, 451, 80 L.Ed.

655, 657 (1936).

Answering this question requires the Court to reconstruct what Dolchin would

have been owed on the petition date had no payment occurred. The Court concludes

that Dolchin would have been owed about $48,000 based on its invoices. The Trustee

testified that because the estate is *administratively* insolvent, Dolchin would have

otherwise received nothing in the Chapter 7 case. T-58,59. While it remains to be seen

what value the notes have, it is in analyzing this element of the preference claim that

-21-

highlights the fact that Dolchin's claim of secured status is a red herring.  At the time of

the transfer, Dochin's claim was unsecured.  It only became secured after the transfer of

the notes when Dolchin took possession of them.  Whether secured or unsecured, the

assignment constituted a transfer of the notes which improved Dolchin's position vis-a-

vis other unsecured creditors.  So on the date of bankruptcy, Dolchin would fare better

with the assignment than without it.  The record demonstrates, then, that as to Dolchin's

taking of the assignment of the promissory notes, it received a preferential transfer.  The

Court accordingly moves on to the affirmative defenses which Dolchin raises.

*Contemporaneous Exchange*

Dolchin argues that even if the assignment is a preference, it is not avoidable

because it qualifies for the "contemporaneous exchange" defense:

> The trustee may not avoid under this section a transfer–
>
> (1) to the extent that such transfer was--
> (A) intended by the debtor and the creditor to or for whose
> benefit such transfer was made to be a contemporaneous
> exchange for new value given to the debtor; and
> (B) in fact a substantially contemporaneous exchange;

11 U.S.C. § 547(c)(1).

*Did the Parties Intend*
*A Contemporaneous Exchange?*

"The critical inquiry in determining whether there has been a contemporaneous

exchange for new value is whether the parties intended such an exchange."  *In re*

*Spada*, 903 F.2d 971, 975 (3d Cir.1990).  The determination of such intent is a question

of fact.  *Id*.  No specific testimony is offered on this point.  However, there is no mystery

as to why the transfer occurred: to keep Dolchin on board as counsel for the Debtor

through the Allstate trial.  The Debtor exchanged the notes in order to obtain assurance

from Dolchin that it would defend the Debtor against the Allstate claims.

*Was New Value Exchanged?*

In addition to intent, the record must show that the Debtor received value.

Section 547 specifically defines "new value" as:

> money or money's worth in goods, services, or new credit,
> release by a transferee of property previously transferred to
> such transferee in a transaction that is neither void nor
> voidable by the debtor or the trustee under any applicable
> law, including proceeds of such property, but does not
> include an obligation substituted for an existing obligation;

11 U.S.C. § 547(a)(2).  "The determination of 'new value' is a mixed question of law and

fact." *In re Kumar Bavishi & Assocs.*, 906 F.2d 942, 943 (3d Cir.1990) (*citing In re

Spada*, 903 F.2d at 975).[12]  Accordingly, the Court must consider first whether new

value was given to the debtor as a matter of law in this case and second the amount of

new value that was given.  *In re Adelphia Automatic Sprinkler Co.*, 184 B.R. 224, 227

(E.D.Pa.1995).  The burden of proof lies with the creditor to show both that new value

was given to the debtor and the specific value of that consideration.  *Id.* at 227; *In re Jet

Florida Sys., Inc.*, 861 F.2d 1555, 1559 (11th Cir.1988).

Intuitively, it would seem that assurances of future representation is a tender of

new value.  The Third Circuit has noted that the definition of new value was intended, as

construed from the legislative history, to codify the usual rules of consideration.  *See

Spada*, 903 F.2d at 976 citing H.R.Rep. No. 95-595, 95th Cong. 1st Sess. 372 (1977),

---

[12]The citation from *Spada* reads slightly differently: "What constitutes new value is a
question of fact." 903 F.2d at 974.  However, as the outcome would not change whichever
interpretation is followed, the Court need not make anything of the discrepancy.

U.S.Code Cong. & Admin.News 1978, pp. 5787, 6328; S.R. No. 95-989, 95th Cong., 2d

Sess. 87 (1978), U.S.Code Cong. & Admin.News 1978, pp. 5787, 5873; *see also Ross*

*v. Philadelphia Housing Authority*, 1997 WL 331830 *5 (Bankr.E.D.Pa.).  The Debtor

was behind on its bills, therefore Dolchin may have considered withdrawing as counsel.

By agreeing to stay on then, Dochin exchanged consideration for the notes.

But even assuming that assurances constitute new value in the purely technical

sense, such assurances must translate into discrete, measurable value for this defense

to succeed: "[A] party seeking the shelter of section 547(c)(1) must [therefore] prove the

specific measure of the new value given the debtor in the exchange transaction he

seeks to protect." *In re Spada*, 903 F.2d at 976 (*quoting In re Jet Florida Sys*., Inc., 861

F.2d at 1558); *see also In re Nucorp Energy, Inc*., 902 F.2d 729, 733 (9th Cir.1990); *In*

*re Robinson Bros. Drilling, Inc*., 877 F.2d 32, 34 (10th Cir.1989) (per curiam). "The

purpose of this rule is to ensure that the debtor receives at least as much in new value

as it transfers away." *In re C.P.P. Export & Import, Inc*., 132 B.R. 962, 965-66

(D.Kan.1991).  New value does not consist of "esoteric or intangible benefits" but

instead "must actually and in real terms enhance the worth of the debtor's estate so as

to offset the reduction in the estate that the transfer caused." *In re Aero-Fastener, Inc*.,

177 B.R. 120, 138 (Bankr.D.Mass.1994).

Here, notes with total face values of $75,000 were transferred out of the estate in

exchange for a promise of continued representation in a lawsuit which the Debtor lost

and resulted in its bankruptcy.  The discrete value of this to the Debtor, if any, at the

time of the transfer is simply impossible to quantify.  The Irrevocable Assignment

pledged the notes to Dolchin.  What the Debtor received in exchange for the notes is

simply too amorphous to meet the test for quantifiable new value.  For that reason, this

defense fails.

*Was the Assignment Made*
*in the Ordinary Course of*
*Business Between the Parties?*

Dolchin also argues that it may keep the payment pursuant to the "ordinary

course of business" defense which provides that :

> (c) The trustee may not avoid under this section a transfer–
> …
> (2) to the extent that such transfer was–
> (A) in payment of a debt incurred by the debtor in the
> ordinary course of business or financial affairs of the debtor
> and the transferee;
> (B) made in the ordinary course of business or financial
> affairs of the debtor and the transferee; and
> (C) made according to ordinary business terms.

11 U.S.C. § 547(c)(2). " 'The purpose of the exception is to leave undisturbed normal

financing relations, because it does not detract from the general policy of the preference

section to discourage unusual action by either the debtor or his creditors during the

debtor's slide into bankruptcy.' " *J.P. Fyfe, Inc. of Florida v. Bradco Supply Corp.*, 891

F.2d 66, 70 (3d Cir.1989)(quoting S.Rep. No. 989, 95th Cong., 2d Sess. 88 (1978),

*reprinted in* 1978 U.S.C.C.A.N. 5787, 5874).  The foregoing criteria are stated in the

conjunctive, therefore all three must be shown in order for the exception to apply.  *Id.* at

69.  Dolchin, as the party seeking to except the payments from avoidance, bears the

burden of proof as to the required elements by a preponderance of the evidence. *See*

*Id.*


*Were the Obligations Secured*

*By the Assignment Incurred in
the Ordinary Course of
Business between the Parties?*

The record reflects that Dolchin was owed for legal services rendered.  *See* D-5,

D-9 through D-11.  Dolchin describes itself as a law firm whose clients are

professionals.  T-95  Legal service is what the firm rendered to the Debtor.  Therefore,

the debts secured by the assignment can be characterized as ordinary as between

Dolchin and the Debtor.

*Was the Transfer Made
in the Ordinary Course of Business
or Financial Affairs of the Parties?*

In determining whether a transfer is "ordinary," "the focus of the inquiry is

subjective, i.e., were the payments made in the ordinary course of dealings between the

parties." *In re RML, Inc*., 195 B.R. 602, 613 (Bankr.M.D.Pa. 1996) *citing In re

Daedalean, Inc*., 193 B.R. 204, 211  (Bankr.D.Md.1996).  Such a determination is

"peculiarly factual," and the following factors are considered:

> the length of time the parties have engaged in the type of
> dealing at issue, whether the subject transfer was in an
> amount more than usually paid, whether the payments were
> tendered in a manner different from previous payments,
> whether there appears any unusual action by either the
> debtor or creditor to collect or pay on the debt, and whether
> the creditor did anything to gain an advantage (such as gain
> additional security) in light of the debtor's deteriorating
> financial condition.

*In re Richardson*, 94 B.R. 56, 60 (Bankr.E.D.Pa.1988); *see also In re Grand Chevrolet,

Inc.*, 25 F.3d 728, 732 (9th Cir.1994).  The creditor must demonstrate some consistency

with other business transactions between the debtor and the creditor, rather than a rigid

conformance to past transactions.  *Daedalean*, 193 B.R. at 211.

-26-

The assignment served as security for payment of past due bills and those anticipated.  T-38  Dolchin's own invoices reflect that it was owed at least $35,000 for outstanding fees on the date of the assignment.  *See* Ex. D-9, 10.  The assignment itself states that it is security for that receivable as well as the costs of defending the Debtor in the Allstate litigation.  *See* D-6.  This had not been done before.  T-25.  The transfer was clearly not ordinary as between the parties; therefore, the Court need not analyze whether it was made according to ordinary business terms.  In sum, this affirmative defense fails as to the irrevocable assignment of the promissory notes.

*Did the Defendants Give*
*New Value After the Transfer?*

The last affirmative defense is that Dolchin gave the Debtor new value *after* the payment which it may use to reduce the amount it must return:

> The trustee may not avoid under this section a transfer–
> …
> (4) to or for the benefit of a creditor, to the extent that, after such transfer, such creditor gave new value to or for the benefit of the debtor–
> (A) not secured by an otherwise unavoidable security interest; and
> (B) on account of which new value the debtor did not make an otherwise unavoidable transfer to or for the benefit of such creditor;

11 U.S.C. § 547(c)(4).  Pursuant to this defense, a transfer is not avoidable to the extent the creditor can establish that the transfer was followed by an advance of new value to the debtor on an unsecured basis. *In re Lease-A-Fleet, Inc.*, 155 B.R. 666, 684 (Bankr.E.D.Pa.1993).[13] In order to calculate the amount of new value to be applied

---

[13]Additionally, the debtor must not have made "an otherwise unavoidable transfer to or for
(continued...)

against preferential payments, most courts apply a "subsequent advance" method of

calculation. The method looks at the 90-day preference period and calculates the

difference between the total preferences and the total advances, provided that each

advance is used to offset only prior (although not necessarily immediately prior)

preferences. *In re RML Corp.,* 195 B.R. 602, 616 (Bankr.M.D.Pa.1996) *citing Meredith*

*Manor, Inc.*, 902 F.2d 257, 259 (4th Cir.1990); *In re M & L Business Machine Co.*, 160

B.R. 851, 855 (Bankr.D.Colo.1993); *aff'd*, 167 B.R. 219 (D.Colo.1994); *and In re Ladera*

*Heights Community Hosp., Inc.*, 152 B.R. 964, 969 (Bankr.C.D.Cal.1993).

The burden of establishing the existence and the amount of new value is on the

creditor who has received the transfer. *In re Discovery Zone, Inc.*, 300 B.R. 856, 859

(Bankr.D.Del.2003).   Again, the amount of new value must be proved with specificity.

*Id.*  The new value which Dolchin rendered is found in their invoices.  *See* Ex. D-5, 9-11.

The term "new value" is defined in the statute as "money or money's worth in …

services."  11 U.S.C. § 547(a)(1).  For the six weeks prior to bankruptcy,[14] Dolchin

rendered services to and received payments from the Debtor.  *See* Appendix to

Opinion.  While the Trustee made clear in his closing that he does not seek recovery of

---

[13](...continued)
the benefit of such creditor" on account of the new value. *In re Toyota of Jefferson, Inc.*, 14 F.3d
1088, 1091 (5th Cir.1994).  In other words, the subsequent value may not have been paid in the
ordinary course of business or as part of a contemporaneous exchange.  Without that qualification,
a creditor might argue that the same subsequent advance used to offset a prior preference was
paid by a subsequent preference in the ordinary course of business.  *See Id.* at 1092–1093.

[14]The assignment occurred on 2/20/04 and the bankruptcy was filed 4/2/04 so only those
services rendered within that time period may be considered for new value purposes.

the $10,000 and $5000 transfers,[15] that does not mean that the Court may ignore those other transfers.  As the Trustee pointed out, those two transfers affect the calculation of the new value which may be used to offset the $75,000 assignment.  New charges which postdate those two transfers must be applied against them first before they may be set off against the $75,000 notes; otherwise, double-counting would occur.  The Appendix attached to this Opinion shows that after the $75,000 transfer, and before the $10,000 payment on 2/23, Dolchin rendered another $8166.58 in services.  That amount must be subtracted from the $75,000 transfer.

After the $10,000 payment of 2/23 and before the $5000 payment on 3/24, another $21,185.64 in services were rendered.  However, $10,000 of those charges must be first applied against the $10,000 payment on 2/23 before any of it may further reduced the $75,000 transfer.  That means another $11,185.64 ($21,185.64 minus $10,000) must be subtracted from the $75,000 transfer.

Finally, there are more services rendered after the $5000 payment and before bankruptcy.  From 3/24 to 4/2, Dolchin rendered $1804.64 in services.  However, all of those charges must be first applied against the $5000 payment.  That leaves nothing to further reduced the $75,000 transfer.  The total of the subsequent new value is $19,352.22 ($8166.58 plus $11,185.64).  Subtracting that amount from the $75,000 transfer yields an avoidable preference of $55,647.78.  *See generally* Appendix.

---

[15]T-142

*The Fraudulent Transfer Claim*

Alternatively, the Trustee seeks to avoid the same two transfers as fraudulent

transfers.  Section § 548 of the Bankruptcy Code provides, in pertinent part:

> (a)(1) The trustee may avoid any transfer of an interest of
> the debtor in property, or any obligation incurred by the
> debtor, that was made or incurred on or within one year
> before the date of the filing of the petition, if the debtor
> voluntarily or involuntarily--
>
> (A) made such transfer or incurred such obligation with
> actual intent to hinder, delay, or defraud any entity to which
> the debtor was or became, on or after the date that such
> transfer was made or such obligation was incurred, indebted;
> or
>
> (B)(i) received less than a reasonably equivalent value in
> exchange for such transfer or obligation; and
>
> (ii)(I) was insolvent on the date that such transfer was made
> or such obligation was incurred, or became insolvent as a
> result of the transfer or obligation;
>
> (II) was engaged in business or a transaction, or was about
> to engage in business or a transaction, for which any
> property remaining with the debtor was an unreasonably
> small capital; or
>
> (III) intended to incur, or believed that the debtor would incur,
> debts that would be beyond the debtor's ability to pay as
> such debts matured,

11 U.S.C. § 548(a).[16]  Section 548(a)(1) contains both an actual fraud provision and a

constructive fraud provision.  *In re Nam*, 257 B.R. 749, 768 (Bankr.E.D.Pa.2000).  The

Trustee asserts that the Defendants are liable under either provision.  Joint PreTrial

---

[16]Although § 544(b) allows the Trustee to utilize state fraudulent transfers laws, he has
limited this cause of action to the federal provision.  T-141.

Statement, 3,4. The Trustee bears the burden of proof on this claim. *Nam*, 257 B.R. at 768 n. 24. The Court will begin with the claim of actual fraud.

*The Record Does not*
*Demonstrate Actual Fraud*

The Trustee sees intent to defraud on the Debtor's part by its "channeling money to its one big creditor." T-140  As to the standard of proof applicable to this evidentiary burden, the Court will require that the Trustee prove his case by a preponderance of the evidence.[17]

Rarely will the transferor admit to acting with a fraudulent purpose so the fact-finder must inquire into the transferor's state of mind at the time the transfer was made. 5 *Collier on Bankruptcy* ¶ 548.04[2][a] (Matthew Bender 15th ed. Revised).  Thus, it is frequently necessary for the trustee to prove actual intent by circumstantial evidence. To do this, a trustee may rely on traditional common law "badges of fraud."  *See, e.g., In re Branz*, 106 B.R. 62, 67 (Bankr.E.D.Pa.1989) overruled on other grounds, *In re Menell*, 37 F.3d 113 (3d Cir.1994).  These indicia include:

> (1) the transfer or obligation was to an insider;
> (2) the debtor retained possession or control of the property transferred after the transfer;
> (3) the transfer or obligation was disclosed or concealed;

---

[17]The Court is aware that there is some disagreement on this point. *Compare In re Lease a Fleet, Inc.*, 155 B.R. 666, 674 (Bankr.E.D.Pa.1993) (employing clear and convincing standard) *with Thompson v. Jonovich (In re Food & Fibre Protection, Ltd.),* 168 B.R. 408, 418 (Bankr.D.Ariz.1994) (preponderance of the evidence standard).  However, the "strong current of opinion now holds that actual intent under 11 U.S.C. § 548(a)(1)(A) need only be shown by a preponderance of the evidence." David B. Young, *Preferences and Fraudulent Transfers*, 849 PLI/Comm 729, 860 (2003) citing *Grogan v. Garner*, 498 U.S. 279 (1991) (applying preponderance standard to fraud claims brought under § 523).  While no appellate court in this district has held that actual fraud claims brought under § 548 are to be judged the same as the § 523 actual fraud claims in *Grogan, supra*, ("preponderance of the evidence), there seems no logical reason not to employ that standard for purposes of judging an actual fraud claim under § 548.

(4) before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;
(5) the transfer was of substantially all the debtor's assets;
(6) the debtor absconded;
(7) the debtor removed or concealed assets;
(8) the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;
(9) the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;
(10) the transfer occurred shortly before or shortly after a substantial debt was incurred; and
(11) the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor."

*In re Pinto Trucking, Inc.*, 93 B.R. 379, 386 (Bankr.E.D.Pa.1988); *see also, e.g., In re Crompton*, 70 B.R. 60, 62 (Bankr.W.D.Pa.1987).  Do either of the transfers bear any indicia of wrongful purpose?

The Court will begin with the $2500 fee which Dolchin received for handling the asset purchase.  Not one of the above eleven badges even remotely applies to that payment.  The testimony clearly supports the position that the transfer was a contemporaneous payment for legal services rendered at the settlement.  Simply put, the payment was perfectly legitimate.

The Court finds the assignment to be free from wrongful motivation.  Beginning with a survey of the examples of fraud badges, the Court sees that only three of the eleven examples (the fourth, eighth and eleventh) might even arguably be present.  The fourth example — that the transfer occurred before the debtor was sued or was about to be sued — is colorable here.  The Debtor may have been the subject of a suit when it made the assignment, but there is little connection between the two circumstances. The transfer was not made to take assets outside the realm of collectibility; rather, it

was made to secure the services of its law firm to prosecute its defense of that lawsuit. T-48. As Dolchin testified, the Debtor intended to fully litigate its defense against Dolchin's advice to settle.

Likewise, the eighth example — that the Debtor did not receive equivalent value in exchange for the assignment — has only superficial appeal. As trial loomed, the Debtor owed Dolchin $35,000 in fees. Ex. D-9, 10. Dolchin informed the Debtor that it would cost another $25,000 to $50,000 to see the case through trial. T-93 The total of those two amounts is roughly equivalent to the face value of the notes. And as it turned out, Dolchin's estimate was not too far off the mark. By the end of the trial, the Debtor owed Dolchin $48,000 but had paid it $15,000. *See* Ex. D-9, 10, 11. The cost of the defense appears to have been about $63,000. This shows the assignment to be a financing vehicle as opposed to an artifice.

Finally, while there is ample evidence that the Debtor was insolvent at the time of the assignment (the eleventh example of a fraud "badge"), that condition neither prompted nor was created by the assignment. Again, the assignment functioned as a retainer for the law firm and not a means to hide assets.

Aside from the badges of fraud, the Court looks elsewhere in the record to see if wrongful intent was behind the assignment. What is noteworthy is the candor of the parties about the purpose behind that transfer. Dolchin feared that its fees might go unpaid so it sought a means to secure their payment. This is expressly stated in the Irrevocable Assignment. D-6 That may make the assignment of notes avoidable on other grounds, but it does not demonstrate an attempt to prejudice other creditors. Moreover, that argument places the emphasis on the state of mind of Dolchin, the

-33-

transferee, when the mental state that matters is that of the Debtor, the transferor.   *See In re Pinto Trucking, Inc.*, 98 B.R. at 386 ("It is the conduct of the transferor, i.e., the Debtor, which must be established to have been fraudulent, not the transferee.") In sum, the Trustee has failed to prove, even by a preponderance of the evidence, that the Debtor assigned the notes in order to defraud its creditors.

*The Constructive Fraud Claim*

The Court turns its attention to the alternative claim that the same transfers to Dolchin are *constructively* fraudulent.  For that claim, "the Trustee must establish that: (1) the Debtor had an interest in the property; (2) the interest was transferred within one year of the filing of the bankruptcy petition; (3) the Debtor was insolvent at the time of the transfer or became insolvent as a result thereof; and (4) the Debtor received less than equivalent value in exchange for such transfer." *In re Gutpelet*, 137 F.3d 748, 751 (3d Cir.1998).  All of this must be proven by a preponderance of the evidence.  *In re C.F. Foods, LP*, 280 B.R. 103, 115 (Bankr.E.D.Pa.2002); *In re Dolata*, 306 B.R. 97, 117 (Bankr.W.D.Pa).  As to the first two elements, there is no doubt that the record establishes both: the Court has already determined in the preference analysis that what was transferred was property of the estate.  Likewise, neither party disputes the date of the payment and assignment.  That leaves the third and fourth elements: reasonably equivalent value and insolvency.[18]

---

[18]Neither the complaint nor the Joint PreTrial Statement explain what condition of financial impairment existed to support the Trustee's fraudulent transfer claim.  At the trial however the Trustee framed issue in terms of "insolvency." T-141.

*Value*

The statute defines "value" as "property, or satisfaction or securing of a present or antecedent debt of the debtor " 11 U.S.C. § 548(d)(2)(A).  The determination of value "depends on all the circumstances surrounding the transaction."  5 *Collier on Bankruptcy* ¶ 548.05[1][b] (Matthew Bender 15th Ed. Revised).  It is largely a question of fact; therefore, considerable latitude is given to the trial court.  *See id.*  The ultimate issue is the impact of the transfer on the debtor's estate.  *Id.*  And because the estate comes into existence upon the filing of the bankruptcy case, value in this context "contemplates only a present advance, or transfer of property as securing for, or the discharge of, an antecedent debt, it generally leaves no room for a mere executory promise to constitute value."  *Id.*

Value is clearly established as to the $2500 payment.  That payment was for services rendered in connection with the asset sale.  The Trustee cannot credibly argue, then, that the Debtor did not receive a fair exchange for that payment.  As to the $2500 payment, then, the constructive fraud claim fails.

As to whether the Debtor received reasonably equivalent value in exchange for the assignment, the record is quite clear regarding why the notes were assigned.  The Debtor was behind on its bills and would incur more fees once the Allstate trial began.  At the time of the assignment, the Debtor owed Dochin $35,000.  *See* Ex. D-9, 10.  After the assignment, more fees would be incurred in the defense of the Allstate claim and, by the petition date, the balance would grow to roughly $48,000.  *See* D-10, 11; Claims Docket #20.  That is significantly less than the $75,000 asset which was transferred out

-35-

of the estate to Dolchin.  The value of what the Debtor received, then, was not

reasonably equivalent to what it transferred in exchange.

*Insolvency*

Turning to the question of the Debtor's solvency, the Court observes that the

Trustee does not enjoy the evidentiary presumption applicable to preferences.  The

burden of proof as to insolvency[19] in a fraudulent transfer claim is placed squarely on

him.  To meet that burden, the Trustee relies on the Claims Register which shows over

$10 million in total claims.  Ex. P-8.  That figure dwarfs the Debtor's receivables.  But,

Dolchin counters, the claims register is rife with amendments and duplicate claims.

That is correct. The Court, however, assured counsel that in taking judicial notice of the

claims register[20] it could winnow out the amended and duplicate claims.  And it has.  In

totaling the claims, the Court has disregarded *as amended* the five insurance claims

(#2,4,5,6,7) and the Labor & Industry claim (#8).  From the five insurance claims that

amend the previous five, the Court has disregarded four as duplicative.  (#11-14).  The

total that results is upwards of $6 million which is more than twice the assets' value.

That figure, however, yields the net worth of the Debtor *as of the petition date*, and not

---

[19]For purposes of proving a constructively fraudulent transfer, the same Bankruptcy Code definition of insolvency that applies to a preference case applies here.  Essentially, it is a balance sheet test in which the sum of the debts is greater than the sum of the assets.  5 *Collier on Bankruptcy* ¶ 548.05[1][a].

[20]*See In re CITX*, 302 B.R. 144, 147 n.3 (Bankr.E.D.Pa.2003) (observing that court may take judicial notice, under Fed.R.Evid. 201 (incorporated into bankruptcy cases by Fed. R. Bankr.P. 9017), of the docket entries of this case, including the claims docket. *See Maritime Electric Co., Inc. v. United Jersey Bank*, 959 F.2d 1194, 1200 n. 3 (3d Cir.1991); *Levine v. Egidi*, 1993 WL 69146 *2 (N.D.Ill.); *In re Paolino*, 1991 WL 284107 *12 n. 19 (Bankr.E.D.Pa.); *see generally In re Indian Palms Associates, Ltd.*, 61 F.3d 197 (3d Cir.1995).

on the date of the assignment which occurred six weeks prior.  What was the Debtor's

financial condition when it made the assignment?

The Court has already discussed the Debtor's solvency for this time period when

considering Dolchin's arguments that the assignment is not an avoidable preference,

and the Court incorporates that discussion herein.  In that analysis , the Court rejected

Mr. Todd's contention that it was the jury verdict in the Allstate matter that marked the

moment in time when Debtor became insolvent.  T-98.  As the Court pointed out, *supra*,

the verdict was based on claims of fraud going back to 2001.  It is alleged that the

Debtor had been submitting fraudulent bills to Allstate which Allstate had been paying.

*Id.*  As a practical matter, then, the Debtor's liability to Allstate, which became the

judgment, existed at least as far back as the date the complaint was filed (2001).

Indeed, this explains why Allstate would not pay the Debtor's successors, Dr. Oren et al,

when they purchased the Debtor's business.  Oren Testimony 4/7/06 T-20, 21.  They

had pending litigation against the Debtor in which they sought to recover all that they

had paid the Debtor.  T-50.  For these reasons the Court finds that the Trustee has

established that the Debtor was insolvent on the date it assigned the promissory notes

to Dolchin.

Other evidence corroborates this.  Mr. Privitera testified to the Debtor's

downward spiral near the time of the assignment.  He recalls that the principals had

considered selling out "a couple of months" before the sale took place.  T-14.  At that

time, the Allstate trial was approaching and the "business was going down."  *Id*.  The

Debtor also appears not to have been able to meet current obligations at this time: it

was behind on its bills to Dolchin so in order to assure payment of the fees past due as

well as those to come, the Debtor pledged the promissory notes to Dolchin.  T-37  This

is something the Debtor had not done before.  T-16, 25.  All of that indicates to the

Court that the Debtor was insolvent on February 20, 2004, the date it assigned the

notes to Dolchin.  With that finding, the Court concludes that the Trustee has

established the elements of an avoidable transfer under the constructive fraud

provisions of the Bankruptcy Code

*Was Dolchin a Good-Faith
Transferee Who Gave Value?*

As an affirmative defense, Dolchin contends that it took the assignment for "value

and in good faith."  *See* Joint PreTrial Statement, 7, Legal Issues Presented.  Dolchin

refers here to subsection (c) of § 548:

> Except to the extent that a transfer or obligation voidable
> under this section is voidable under section 544, 545, or 547
> of this title, a transferee or obligee of such a transfer or
> obligation that takes for value and in good faith has a lien on
> or may retain any interest transferred or may enforce any
> obligation incurred, as the case may be, to the extent that
> such transferee or obligee gave value to the debtor in
> exchange for such transfer or obligation.

11 U.S.C. § 548(c).  As this is an affirmative defense, Dolchin bears the burden of proof.

 *See In re Foxmeyer Corp.*, 286 B.R. 546, 572 (Bankr.D.Del.2002)  Good faith is an

"indispensable element" of this saving benefit provision. 5 Collier on Bankruptcy, ¶

548.07 In this context, what is meant by the term "good faith"?

The Bankruptcy Code does not define either "good faith or "good faith

transferee."  *In re Burry*, 309 B.R. 130, 136 (Bankr.E.D.Pa.2004).[21]  *Collier* has

---

[21]Likewise, the legislative history related to section 548(c) never defines, and scarcely
(continued...)

observed that because the question of good faith arises in varied circumstances, the

term defies an easy or precise definition. *See* 5 *Collier*, ¶ 548.07[2][a]; *In re Roco Corp*.,

701 F.2d 978, 984 (1st Cir.1983) (noting that "good faith" is not susceptible of precise

definition).  Accordingly, courts generally evaluate good faith defenses on a

case-by-case basis. *In re Model Imperial, Inc*., 250 B.R. 776, 797 (Bankr.S.D.Fla.2000).

This requires the court examine what the transferee objectively "knew or should have

known," such that a transferee does not act in good faith when it has sufficient

knowledge to place it on inquiry notice of the voidability of the transfer.  *In re Sherman*,

67 F.3d 1348, 1355 (8th Cir.1995); *see also In re M & L Business Machine Co.*, 84 F.3d

1330, 1335-36 (10th Cir.1996) (stating that "the presence of any circumstance placing

the transferee on inquiry as to the financial condition of the transferor may be a

contributing factor in depriving the former of any claim to good faith unless investigation

actually disclosed no reason to suspect financial embarrassment"); *In re Agricultural

Research & Tech. Group*, 916 F.2d 528, 535-36 (9th Cir.1990) (stating that courts look

to what the transferee objectively knew or should have known in questions of good faith,

rather than examining what the transferee actually knew from a subjective standpoint).

In its closing, Dolchin's emphasized that the legal services it provided were

rendered in "good faith." T-144.  The Trustee never argues otherwise; his complaint is

with the state of mind that prompted Dolchin to accept the assignment in the first place.

T-140.  The Court, like the Trustee, focuses on Dolchin's request for security and its

---

[21](...continued)
addresses, good faith. *See* S Rep. No. 989, 95th Cong., 2d Sess. 89-90 (1978); HR Rep. No. 595,
95th Cong., 1st Sess. 375 (1977), U.S.Code Cong, & Admin.News 1978, 5787, 5875-76, 5963,
6331.

decision to accept the pledge of the notes. The assignment occurred approximately one month after the Debtor sold it business and on the eve of the Allstate trial. Dochin had been the Debtor's legal counsel for years providing both general representation as well as specific case defense to the Debtor. *See* D-5, 9-11, T-36, 37, Docket No. 2:01-cv-05076. It most likely knew why the Debtor got out of the business because it represented the Debtor in the sale of the business to the corporate defendants. Dolchin certainly knew the seriousness of the Allstate allegations because it had been defending the Debtor throughout that litigation. If there was any doubt on this score, the Debtor's inability to pay currently for the defense of the Allstate claim alerted Dolchin of the Debtor's dire financial condition. Dolchin knew it had leverage over the Debtor in the days before trial and took advantage of that to the detriment of the creditors of this bankruptcy estate. On this record, Dolchin cannot satisfy the good faith test.

*Summary*

The Trustee's Motion to Approve Settlement is granted. The Trustee has established that the assignment of the promissory notes to Dolchin is avoidable and recoverable as a preference to the extent of $55,647.78. More importantly, however, he has also established that he is entitled to the *complete* avoidance of the assignment as a fraudulent transfer. Therefore, the Court shall direct that Dolchin turnover the promissory notes to the Trustee and Dolchin shall have an unsecured claim for the unpaid amounts owed to it.

An appropriate order follows.

By the Court:

_____
Stephen Raslavich
United States Bankruptcy Judge

Dated:  <u>May 18, 2006</u>

APPENDIX

| Date | Services Rendered | Subsequent Charges | Payment/ Transfer | Remaining Preference | Record |
|------|-------------------|--------------------|--------------------|----------------------|--------|
| 2/20/04 | | | $75,000 Irrevocable Assignment | | D-6, D-7 |
| 2/20/04 | Correspondence from Goldberg, Esq; Correspondence to Goldberg; Correspondence to Gottlieb, Esq; Prepare Pretrial Memorandum; Revise Correspondence to Judge Joyner; Prepare Exhibits; Telephone conference with Wall re: Deposition of Mary Dickler; Conference with Clients; Conference with Smaczylo; Conference with Mary Dickler; Deposition of Dickler 5.7 hrs | $1995 | | | D-10 |
| 2/20/04 | copying and court reporter | $1081.58 | | | D-10 |
| 2/21/04 | Listen to voicemail message from Lindy, Esq.; Left voicemail message for Lindy re: Dr. Diamond; Corresp to Neiger, Esq re: discovery for State Farm case; Listen to voicemail from Dr. Izzo. Tel Conf with Privitera; Prepare for Trial 5.2 hrs | $ 1820 | | | D-10 |
| 2/23/04 | Prep of Motion for Judgment on the Pleadings 0.60 hrs | $120 | | | D-10 |
| 2/23/04 | Listen to voicemail message from Lindy, Esq; Listen to voicemail message from Lindy; Correspondence from Smith Esq. Deposition of Dr. Diamond; Correspondence to Smith; Review deposition of Young; trial 9.0 hrs | $3150 | | $66,833.42 | D-10 |
| 2/23/04 | Payment | | $10,000[22] | $76,833.42 | D-9 |
| 2/24/04 | trial; Telephone conference with Dr.Izzo; Left voicemail message for Lindy, Esq re: Dr. Diamond 9.0 hrs | $3150 | | | D-10 |
| 2/24/04 | Legal research per JWT re: prescriptions 0.50 | $100 | | | D-10 |

---

[22]Again, the Trustee made clear in his closing that he does not seek the recovery of this transfer; however, it necessarily affects the calculation of subsequent new value.  T-142.

| Date | Services Rendered | Subsequent Charges | Payment/ Transfer | Remaining Preference | Record |
|------|-------------------|--------------------|-------------------|---------------------|--------|
| 2/25/04 | Prep of Motion for Judgment on Pleadings 3.1 hrs. | $620 | | | D-10 |
| 2/25/04 | trial 10 hours | $3500 | | | D-10 |
| 2/25 | Travel round trip to drop off box to JWT at Federal court 0.5 hrs | $37.50 | | | D-10 |
| 2/25/06 | Travel | $15 | | | |
| 2/26 | trial 8 hrs | $2800 | | | D-10 |
| 2/27/04 | trial 5 hrs | $1750 | | | D-10 |
| 2/27/04 | Left voicemail message for Gottlieb, Esq; Left voicemail message for Semanoff, Esq; Telephone Conference with privitera 0.3 hrs | $105 | | | D-10 |
| 2/27/04 | Trip to and from Federal Court to assist JWT 1 hrs | $200 | | | D-10 |
| 2/27/04 | Travel | $16 | | | D-10 |
| 2/28/04 | Correspondence from Goldberg, Esq re Voluntary Disclosure; Correspondence to Clients re disclosures by plaintiff; Correspondence to Semanoff, Esq re: State Farm; Correspondence to Lindy, Esq re: State Farm; Correspondence to Herz, Esq re : State Farm; Correspondence to Goldberg re: Dr. Cho; lvm Gottlieb, Esq; Correspondence form Goldberg re: Deposition of Dr. Diamond in Seawright case; Left voicemail message for Lendt re: Deposition fo Dr. Diamond 1.10 hrs | $385 | | | D-10 |
| 2/29/04 | research and filing fee | $31.14 | | | D-10 |
| 3/01/04 | Listen to voicemail message from Lindy, Esq; Left voicemail message for Lindy; Left voicemail message for Wall, Esq; Listen to voicemail message from Wall 0.30 hrs | $105 | | | D-10 |
| 3/1/04 | Travel | $56 | | | D-10 |
| 3/2/04 | Telephone conference with Semanoff, Esq re: verdict; Review and Revise Motion for Judgment on Pleadings; Conference with Privitera and Moldover; Leave message for Parker 1.00 hrs | $350 | | | D-10 |
| 3/3/04 | Listen to voicemail message from Gottlieb, Esq; Left voicemail message for Gottlieb; Telephone conference with Parker; Review Judgment; Correspondence to clients re Judgment 0.80 hrs | $280 | | | D-10 |
| | | | | | |

| Date | Services Rendered | Subsequent Charges | Payment/ Transfer | Remaining Preference | Record |
|---|---|---|---|---|---|
| 3/5/04 | listen to voicemail message from Dean Parker; Left voicemail message for Parker; Listen to voicemail message fr Parker; Telephone conference with Privitera; Left voicemail message for Gottlieb, Esq. 0.3 hrs | $105 | | | D-10 |
| 3/9/04 | Research re: post verdict motions 2.4 hrs | $480 | | | D-11 |
| 3/9/04 | Conference with JM re : Rule 59 Motion; Prepare draft Qualified Protective Order; Correspondence with Neiger, Esq re: QPO 0.50 hrs | $175 | | | D-10 |
| 3/10/04 | Listen to voicemail message from Bernheim, Esq re: Parker; Telephone conference with Privitera re: Bernheim; Left voicemail message for BWK; Telephone Conference with Gottlieb, Esq; Telephone conference with Neiger, Esq re Qualified Protective Order for State Farm case; Telephone conference with Bernheim re: case strategy and settlement 1.50 hrs | $525 | | | D-10 |
| 3/10/04 | Research re: Rule 59 motion 0.70 hrs | $140 | | | D-11 |
| 3/11/04 | Correspondence from Wall Esq re: Motion to Amend Verdict & seeking treble damages; Conference with JM re: researching legal issues | $140 | | | D-10 |
| 3/11/04 | Research re Post Verdict motions 3.30 hrs | $660 | | | D-11 |
| 3/12/04 | Left Voicemail message for Wall Esq re Rule 59 motion; Telephone conference with Wall; Correspondence to Wall re: stipulation to extend pleading deadline 0.30 | $105 | | | D-10 |
| 3/12/04 | Research re post verdict motions 0.6 hrs | $120 | | | D-11 |
| 3/16/04 | Telephone conference with Semanoff, Esq re: joint and several liability 0.40 hrs | $140 | | | D-10 |
| 3/17/04 | Telephone conference with Wall, Esq re: extend motion deadline; Correspondence to Judge Joyner; Telephone conference with Briskin, Esq 0.70 hrs | $245 | | | D-10 |
| 3/18/04 | strat w/JWT re: brief; prep of rule 59 motion 7.10 hrs | $1420 | | | D-11 |
| | | | | | |

| Date | Services Rendered | Subsequent Charges | Payment/ Transfer | Remaining Preference | Record |
|------|-------------------|--------------------|--------------------|----------------------|--------|
| 3/19/04 | Conference with clients and Briskin Esq and Bernheim, Esq and Gottlieb, Esq; Conference with Gottlieb; Listen to voicemail message from Privitera; Telephone conference with Privitera re: settlement issues; Revise Rule 59(e) motion; Telephone conference with Wall, Esq re: post verdict motions; Prepare response to Rule 59(e) motion by Allstate; Revise Rule 59(a)motion. 4.3 hrs | $1505 | | | D-10 |
| 3/20/04 | Revise Rule 59 Motion; Revise response to plaintiff's Rule 59 motion; Conference with PM re: research for motion response; Revise pleadings; Correspondence to counsel for individuals 3.8 hrs | $1330 | | | D-10 |
| 3/22/04 | Revise Motion response; Review and Revise Memorandum of Law; Correspondence to court; final review of pleadings 1.70 hrs | $595 | | $55,647.78 | D-11 |
| 3/23/04 | Payment | | $ 5000[23] | | D-10 |
| 3/24/04 | Research re: Response to Motion for Judgment on the Pleadings 0.80 hrs | $160 | | | D-11 |
| 3/24/04 | Expense support staff | $97.44 | | | D-11 |
| 3/26/04 | Telephone conference with Rich P re :Review federal rules of procedure 0.4 | $108 | | | D-11 |
| 3/29/06 | Telephone conference with Rich P re : bankruptcy filing, cost of transcript, possible stay of execution 0.3 hrs | $81 | | | D-11 |

---

[23]Again, as explained *supra*, recovery of this transfer is not being sought by the Trustee; however, it affects the calculation of subsequent new value.  This is because the charges which postdate it must be deducted first from the $5000 transfer and any remainder may further reduce the resulting preference from the previous page.  In this case, the charges subsequent to the $5000 payment (3/24 to 4/3) are less than the amount of that payment ($1804.64).  Thus, those charges may not further reduce the avoidable preference.

| Date | Services Rendered | Subsequent Charges | Payment/ Transfer | Remaining Preference | Record |
|------|-------------------|--------------------|--------------------|----------------------|--------|
| 3/29/04 | Listen to voicemail message from BWK re: Writs of Attachment; Telephone conference with Gottlieb, Esq re: case strategy; Telephone conference with Privitera 0.50 hrs | $175 | | | D-11 |
| 3/31/04 | subpoena service legal research | $38.20 | | | D-11 |
| 4/01/04 | Prep of response to Goldberg's reply to Motion for Judgment on Pleadings 5.2 hrs | $1040 | | | D-11 |
| 4/01/04 | Telephone conference with JM re: motion for State Farm case; Listen to voicemail message from Dean Parker; Telephone conference with Parker re: status 0.3 hrs | $105 | | | D-11 |
| Avoidable Preference | | | | $55,647.78 | |

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

IN RE                                         : CHAPTER 7
                                              :
AMERICAN REHAB & PHYSICAL                     :
THERAPY, INC.                                 :
                                              :
_____  CASE NO. 04-14562
                                              :
ROBERT H. HOLBER, TRUSTEE                     :
                                              :
                           PLAINTIFF          :
                  V.                          :
                                              :
DOLCHIN SLOTKIN & TODD, P.C.,                 :
ADVANCED MEDICINE ASSOCIATES, P.C.,           :
B.N.A., P.C.,                                 :
AMBULATORY CARE CENTER P.C.,                  :
ARIE OREN, M.D., AHUVA OREN, M.D.,            :
ANDREW BERKOWITZ, M.D.                        :
                                              :
                         DEFENDANTS  : ADVERSARY PROCEEDING NO. 04-0847
_____               :

# ORDER

AND NOW upon consideration of the Trustee's Complaint and the Trustee's

Motion to Approve Settlement, the answers and responses of the Defendants, and after

hearings held on March 22 and April 6, 2006, and for the reasons stated in the

foregoing Opinion, it is

ORDERED that Judgment is entered in favor of the Trustee and against Dolchin,

Slotkin & Todd, PC, for turnover of the three Judgment Notes dated January 21, 2004

which the corporate Defendants gave the Debtor pursuant to the Asset Purchase

Agreements of that same date; and it is

FURTHER ORDERED that the Trustee's Motion to Approve Settlement is

Granted.

By the Court:

_____

Stephen Raslavich
United States Bankruptcy Judge

Dated:   May 18, 2006

**MAILING LIST:**

George Conway, Esquire
Office Of The U.S. Trustee
833 Chestnut Street
Suite 500
Philadelphia PA  19106

Paul A. Bucco, Esquire
DAVIS BUCCO & ARDIZZI
10 East 6th Avenue, Ste. 100
Conshohocken, PA 19428

Dexter K. Case, Esquire
Case & DiGiamberardino, P.C.
541 Court Street
Reading, PA 19601

Dolchin Slotkin & Todd, P.C.
One Commerce Square  24th Floor
2005 Market Street
Philadelphia, PA 19103

Albert A. Ciardi, Esquire
CIARDI & CIARDI, PC
One Commerce Square, Ste 2020
Philadelphia, PA 19102

Kenneth E. Aaron, Esquire
Jeffrey S. Cianciulli, Esquire
WEIR & PARTNERS LLP
The Widener Building, Ste 500
1339 Chestnut Street
Philadelphia, PA 19107

A. Oren, MD, Pro se
612 Fayette Street, Ste 202
Conshohocken, PA 19428

Ahuva Oren, MD
Advanced Medicine Associates, PC
5337 Germantown Avenue
Philadelphia, PA 19144

Andrew Berkowitz, MD
B.N.A., PC
813-A Adams Avenue
Philadelphia, PA 19124-2477

Ahuva Oren, MD
Ambulatory Care Center, PC
1709 South Broad Street
Philadelphia, PA 19148

Robert H. Holber, Trustee
HOLBER & STANWOOD, LLC
41 East Front Street
Media, PA 19063